## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

NELSON GOMES, individually, derivatively and on
behalf of all others similarly situated,

                Plaintiff,

      - against -

AMERICAN CENTURY COMPANIES, INC., AMERICAN
CENTURY GLOBAL INVESTMENT MANAGEMENT, INC.,
JAMES E. STOWERS, JR., JAMES E. STOWERS, III,
JONATHAN S. THOMAS, THOMAS A. BROWN, ANDREA
C. HALL, DONALD H. PRATT, GALE E. SAYERS, M.
JEANNINE STRANDJORD, TIMOTHY S. WEBSTER,
WILLIAM M. LYONS, ENRIQUE CHAN, MARK
KOPINSKI, and BRIAN BRADY,

                Defendants,

      - and -

AMERICAN CENTURY WORLD MUTUAL FUNDS, INC.,
doing business as AMERICAN CENTURY
INTERNATIONAL DISCOVERY FUND,

                Nominal Defendant.

**VERIFIED DERIVATIVE AND
CLASS ACTION COMPLAINT**

**and**

**JURY DEMAND**

Plaintiff alleges:

### OVERVIEW

1.      Plaintiff is an investor in a mutual fund offered by Nominal Defendant American Century World Mutual Funds, Inc. ("ACWMF"). Defendants, the fiduciaries responsible for managing and advising the mutual fund – known as the American Century International Discovery Fund (the "Fund") – knowingly caused the Fund unlawfully to use investors' money to purchase shares of two illegal off-shore Internet gambling businesses that accepted and processed wagers from gamblers in the U.S. These two entities were bwin Interactive Entertainment AG (formerly, BETandWIN.com Interactive Entertainment AG) ("Bwin") and NETeller Plc ("NETeller"). Following an increase in United States law

enforcement actions directed against illegal off-shore gambling businesses in the summer of 2006, the Fund lost millions of dollars as a result of Defendants' illegal investments.

      2.     The illegality of Internet gambling was well-established before Defendants made the investments at issue. For example, prior to 2006:

      (a) the United States Department of Justice ("DOJ") had issued public warnings that Internet gambling companies that take wagers from gamblers in the U.S. were criminal organizations – and cautioned the public that supporting them was itself a crime;

      (b) NETeller had disclosed to Defendants in its April 8, 2004 prospectus that the "view of the US Department of Justice" was that NETeller's principal operations violated various criminal statutes in the U.S. and that there "could be no assurance that the US will not threaten or try to prosecute the NETeller Group under federal law at some stage under existing or future regulations."

      (c) there had been successful prosecutions of principals of similar off-shore businesses, and those prosecutions had been widely reported in the press;

      (d) the DOJ had prohibited financial institutions from processing financial transactions for off-shore Internet gambling businesses that take wagers from gamblers in the U.S.; and

      (e) the federal government had seized millions of dollars that PartyGaming Plc ("PartyGaming") (an illegal gambling business) had paid Discovery Communications (the television and media company that owns the Travel Channel) and other media companies for advertising.

2

3. Prior to making their investments in NETeller, Defendants knew that purchasing NETeller shares violated U.S. criminal laws, including 18 U.S.C. § 1955 ("§ 1955"). That statute makes it a felony to "own all or part of an illegal gambling business."

4. Pursuant to a July 17, 2007 non-prosecution agreement with the United States Attorney's Office for the Southern District of New York ("the USAO"), NETeller agreed to forfeit $136 million in criminal proceeds. NETeller also admitted that 88% of its customers were North American residents, the majority of which were U.S. residents. NETeller stipulated that in 2005, it generated over $120 million in illegal revenue from U.S. residents. On Paragraph 14 of the Statement of Admitted Facts attached to the agreement, the USAO alleged – and NETeller agreed – to facts establishing that NETeller's investors knew or should have known the company was an illegal gambling business. For example, the USAO required NETeller to acknowledge that "in its [2004] IPO prospectus, NETeller plc stated in substance" the company's violations of various federal criminal statutes, including § 1955.

5. Prior to making their investments in Bwin, Defendants knew that purchasing Bwin's shares violated § 1955. Prior to and continuing during the time when Defendants caused the Fund to make its investments in Bwin, the American Century mutual fund complex, including ACC and many of the defendants herein, caused another American Century mutual fund to purchase shares of PartyGaming that at one point were worth $100 million. In the prospectus that PartyGaming issued in connection with its June 2005 IPO, PartyGaming disclosed that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities."

6. On or about December 16, 2005, Bwin publicly announced that it would invest over $600 million to capture a significant share of the illegal Internet gambling market in

3

the U.S. that PartyGaming targeted. Bwin disclosed that it would acquire 100% of the shares of Sweden-based Ongame e-solutions AB ("Ongame"), a company that, like PartyGaming, earned a significant percentage of its revenues from accepting wagers from gamblers in the U.S.

7.     Bwin announced that it would pay for 60% of the acquisition in cash. Bwin was to raise this money by issuing and selling an additional 4 million shares of stock (the "New Shares"). Bwin also disclosed that it intended to pay for the remaining 40% of Ongame's acquisition price through a direct exchange of Bwin stock.

8.     According to public information provided by Bwin and various analyst reports relied upon by Defendants prior to making their investments, Ongame generated 80% of its $130 million in annual revenue from gamblers in the United States. Defendants knew that by acquiring Ongame, Bwin was undertaking to capture a major portion of the illegal U.S.-based gambling market, in violation of numerous state and federal laws. In particular, Defendants knew that Bwin would attempt to leverage its existing gambling infrastructure outside the U.S. to expand Ongame's already sizeable illegal distribution channels within the United States.

9.     On or before its acquisition of Ongame in March 8, 2006, Bwin became an "illegal gambling business" as that term is defined in § 1955.

10.     Defendants knew that Bwin intended to become an illegal gambling business through its acquisition of Ongame. Nevertheless, immediately after Bwin's announcement in December 2005 that it intended to acquire Ongame, Defendants caused ACWMF, through the Fund, to begin purchasing millions of dollars worth of shares of Bwin. Defendants did so to participate in the expected profits from Bwin's illegal U.S.-based revenue and to provide Bwin with the necessary capital to expand its criminal operations in the U.S.

11.     On July 16, 2006, the U.S. government increased law enforcement against illegal gambling companies such as Bwin and NETeller. The government began the crackdown by arresting David Carruthers, the Chief Executive Officer of one of Bwin's competitors, BetOnSports Plc. Carruthers was brought to the Eastern District of Missouri to stand trial before United States District Judge Carol E. Jackson (Case No. 4:06-CR-337). Shortly after Carruther's arrest, on September 15, 2006, French law enforcement authorities arrested Bwin's co-chief executives Norbert Teufelberger and Manfred Bodner on gambling-related criminal charges.

12.     In the wake of increased law enforcement actions in the United States against the illegal operations of offshore gambling companies, Bwin shut down its US operations and took an impairment charge of approximately $680 million.

13.     On January 15, 2007, NETeller's founders, Stephen Lawrence and John Lefebvre, were arrested and charged with conspiracy to violate various anti-gambling laws, including § 1955. Lawrence and Lefebvre pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They also agreed to personally forfeit $100 million in criminal proceeds. After the arrests of Lawrence and Lefebvre, NETeller was forced to shut down its U.S.-facing operations and abandon its primary source of revenue.

14.     In April 2009, PartyGaming entered into a non-prosecution agreement with the United States Attorney for the Southern District of New York in which it agreed to forfeit $105 million in criminal proceeds because its principal business (constituting approximately 87% of its revenue) violated several federal criminal statutes, including § 1955.

15.     In 2008, one of PartyGaming's founders, Anurag Dikshit, pleaded guilty to gambling offenses in the Southern District of New York. Under his plea agreement, Dikshit agreed to forfeit $300 million in criminal proceeds and face a possible two-year prison sentence.

16.     At all relevant times, the nature of Bwin and PartyGaming's operations in the United States were identical for all relevant legal purposes.

17.     On January 8, 2010, Carruthers was sentenced by Judge Jackson to 33 months imprisonment. Previously, Judge Jackson sentenced BetOnSports founder Gary Kaplan to 51 months in jail and ordered him to forfeit $43,650,000 in criminal proceeds. Judge Jackson also accepted a guilty plea by BetOnSports to racketeering conspiracy and ordered the company to forfeit $28,200,000 in criminal proceeds. BetOnSports was a direct competitor of Bwin.

18.     Section 1955(a) provides that whoever "owns all or part of an illegal gambling business" is guilty of a felony. By causing the Fund to purchase shares in an illegal gambling business, Defendants caused the Fund to own part of an illegal gambling business in violation of § 1955(a).

19.     To evade the reach of the U.S. criminal justice system, neither NETeller nor Bwin offered its shares for sale to, or for the benefit of, persons in the U.S. NETeller and Bwin did not list their shares to be traded on any U.S. exchange through American Depository Receipts or otherwise because the DOJ considered the companies to be illegal gambling businesses.

20.     Similarly, the four million New Shares that Bwin issued to finance the expansion of its illegal U.S.-based operations were not available to U.S. investors. According to a March 1, 2006 press release from Bwin, the New Shares were only available "outside the United States to non-U.S. persons."

21.     Because shares of NETeller and Bwin could not be purchased in the U.S., Defendants had to purchase shares overseas to circumvent these restrictions

6

22.     In making these unlawful investments, Defendants took a reasonably foreseeable risk that the investments would lose value when law enforcement authorities took steps to enforce the law.

23.     Because of Defendants' wrongdoing, the Fund and its investors lost over 85% of the investments in Bwin following actions by the U.S. authorities to enforce U.S. law.

24.     The government law enforcement actions, and the investment losses that followed those enforcement actions, were reasonably foreseeable and part of the risk that Defendants knowingly took when they invested in illegal gambling businesses.

25.     Defendants' illegal investments for the Fund's portfolio directly injured Plaintiff and other investors in the Fund because the value of shares in the Fund is calculated daily on the basis of the net asset value of the Fund's portfolio. Each dollar lost by Defendants' investments in an illegal gambling business resulted in a dollar loss to the Fund portfolio and to the investors in the Fund on a *pro rata* basis.

26.     Defendants violated their fiduciary duties to the Fund and its investors by causing ACWMF, through the Fund, to make illegal investments in NETeller and Bwin. Accordingly, Defendants are not permitted to retain any compensation, including management fees, that the Fund and its investors paid them from the time that Defendants first caused the Fund to invest in an illegal gambling business.

27.     The losses suffered by ACWMF and the Fund's investors were the direct, proximate, reasonably foreseeable, and natural consequence of Defendants causing ACWMF, through the Fund, to own part of an illegal gambling business. When increased law enforcement in the U.S. against illegal gambling businesses such as Bwin and NETeller choked off the

7

companies' primary source of revenue, the value of their shares plummeted to account for the loss or potential loss of such illegal revenue.

28.     Defendants are the individuals and entities responsible for causing ACWMF, through the Fund, to purchase, and to continue to own, the illegal investments that led to Plaintiff's injuries.

29.     Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), as well as common law claims for breach of fiduciary duty, negligence, and waste.

30.     Defendants, each of whom is a person or entity employed by or associated with ACWMF, conducted the affairs of ACWMF through a pattern of racketeering. Specifically, each of the Defendants knowingly developed, implemented, and continued (or conspired to develop, implement, and continue) an investment strategy pursuant to which Defendants caused ACWMF, through the Fund, repeatedly and over a significant period of time to purchase shares in "illegal gambling business[es]" as that term is used in § 1955.

31.     Each time that Defendants caused ACWMF to purchase stock in an illegal gambling business, they caused ACWMF to became an owner of part of an illegal gambling business in violation of § 1955.

32.     A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B).

33.     By causing ACWMF to purchase stock of an illegal gambling business repeatedly and over a significant period of time, Defendants conducted the affairs of ACWMF through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). They also conspired to

violate 18 U.S.C. §1962(c) within the meaning of 18 U.S.C. § 1962(d). They were also guilty of negligence, breach of fiduciary duty, and corporate waste.

34.     Because Defendants' unlawful conduct injured ACWMF through the Fund, Plaintiff has named ACWMF as a nominal defendant, and Plaintiff asserts derivative claims on behalf of ACWMF.

35.     Because Defendants' wrongdoing injured numerous investors in the Fund in exactly the same way, this action is also brought as a class action.

36.     Plaintiff seeks to represent a class of investors in ACWMF (the "Class") who first purchased shares in the Fund before July 17, 2006 and still held shares after July 17, 2006 (the "Class Period").

## THE PARTIES

**Plaintiff**

37.     Plaintiff is a citizen of California. He first acquired shares in the Fund in 1997 for investment purposes and still owns shares in the Fund.

**Nominal Defendant**

38.     ACWMF is a corporation organized under the laws of the State of Maryland. It has its principal place of business at 4500 Main Street, Kansas City, Missouri 64111. It is registered under the Investment Company Act of 1940 (the "1940 Act") as an open-end investment management company.

39.     ACWMF is a "series" mutual fund. As such, it has two or more portfolios of securities, each offering a separate series or class of stock to investors. Each portfolio of a series mutual fund generally has different investment objectives, policies, practices, and risks. The shareholders of each portfolio do not participate in the investment results of any other portfolio

9

and must look solely to the assets of their portfolio for most purposes, including redemption, liquidation, earnings, and capital appreciation. Each series of stock represents a different group of stockholders with an interest in a segregated portfolio of securities. Each separate portfolio is commonly referred to as a "fund." Such portfolios are not separate legal entities. However, they are sometimes treated as separate entities for some purposes. For example, each has a separate tax identification number. Similarly, with a few notable exceptions, the Securities and Exchange Commission ("SEC") and its staff have applied the provisions of the 1940 Act to a series fund as if the individual portfolios of that fund were separate investment companies.

40.     ACWMF offers a "series" of shares known as American Century International Discovery Fund, which is referred to herein as the "Fund," though it is not a separate legal entity. In addition to the Fund, ACWMF also comprises 10 other funds, none of which is a separate legal entity. ACWMF has a single board of directors, which manages all 11 of its funds.

41.     ACWMF, through its managers, is hostile and antagonistic to the enforcement of the claims set forth herein, such that it is properly aligned as a defendant for purposes of diversity of citizenship.

**Defendants**

42.     Defendant American Century Companies, Inc. ("ACC") is incorporated in the state of Maryland and has its principal place of business at 4500 Main Street, Kansas City, Missouri 64111.

43.     ACC is an investment management company that controls ACWMF and the Fund through its subsidiary, American Century Global Investment Management, Inc. ("ACGIM"). ACC also controls ACWMF through its selection and appointment of the executives and the entire board of directors of ACWMF.

44.     Defendant ACGIM is incorporated in the state of Delaware and has its principal place of business at 666 Third Avenue, New York, New York 10017.

45.     ACGIM serves as the investment adviser to dozens of investment companies controlled by ACC, including ACWMF and the Fund. ACGIM was responsible for managing the Fund and implementing the investment strategy complained of herein.

46.     Defendant James E. Stowers, Jr. ("Stowers Jr.") is Chairman of ACWMF, a director and controlling shareholder of ACC, and a director of ACGIM. Stowers is responsible for overseeing the investment strategy complained of herein.

47.     Defendant Jonathan S. Thomas ("Thomas") is the President and Chief Executive Officer of ACWMF and has been since January 2007. He was the Executive Vice President of ACWMF from November 2005 through February 2007. Thomas exercised operational or managerial oversight over the portfolio holdings of the Fund, including the investment strategy complained of herein.

48.     At all times relevant to this action, Defendants Stowers Jr., Thomas, James E. Stowers, III ("Stowers III"), Thomas A. Brown ("Brown"), Andrea C. Hall ("Hall"), Donald H. Pratt ("Pratt"), Gale E. Sayers ("Sayers"), M. Jeannine Strandjord ("Strandjord"), and Timothy S. Webster ("Webster") (collectively, the "Directors") were members of the board of directors of ACWMF, with the exceptions of Stowers III and Webster, who ceased serving as directors in 2007 and 2008, respectively.

49.     Each of the Directors allowed ACWMF, through the Fund, to invest or continue its investments in an illegal gambling business.

50.     Each of the Directors had a fiduciary duty to act in the best interests of the shareholders of the ACWMF and the Fund.

11

51.    At all times relevant to this action, Brown, Hall, Pratt, Sayers, Strandjord, and Webster were the so-called "independent directors" of ACWMF (the "Independent Directors"). Webster is no longer a director. Two of the current independent directors of ACWMF (not defendants herein) were not directors of ACWMF during the wrongdoing that is the subject of this Complaint.

52.    In 2005 and 2006, ACWMF disclosed in its filings with the SEC that as a part of their duties, the members of its board of directors, including the Independent Directors, reviewed "fund performance, shareholder services, audit and compliance information, and a variety of other reports from the advisor [ACGIM] concerning fund operations. In addition to this annual review, the board of directors oversees and evaluates on a continuous basis at its quarterly meetings the nature and quality of significant services performed by the advisor, fund performance, audit and compliance information, and a variety of other reports relating to fund operations."

53.    As reported in ACWMF's securities filings in 2005 and 2006, the Directors also considered whether ACWMF "conducted its business ethically." Such review included whether the other defendants – including ACC, ACGIM, and their executives – were causing the Fund to make illegal investments contrary to U.S. federal and state criminal laws.

54.    Defendant William M. Lyons ("Lyons") was President of ACWMF from September 2000 through January 2007. Lyons also served as the Chief Executive Officer of ACC from September 2000 through January 2007. He was primarily responsible for the day-to-day management of the Fund and implementing the investment strategy complained of herein.

55.     Defendant Enrique Chan ("Chan") at all relevant times was the Chief Investment Officer of the International Equity group within ACC. He was responsible for implementing the investment strategy complained of herein.

56.     Defendants Mark Kopinski ("Kopinski"), and Brian Brady ("Brady") at all relevant times were the co-portfolio managers of the Fund. They were responsible for developing and implementing the investment strategy complained of herein. In addition, Kopinski is also currently the Chief Investment Officer of the International Equity Discipline group within ACC.

57.     The individual defendants are citizens of the states of New York, Connecticut, Missouri, Kansas and Illinois.

**JURISDICTION AND VENUE**

58.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), 1337 (commerce regulation) and 1367(a) (supplemental jurisdiction) and 18 U.S.C. § 1964 (RICO). There is complete diversity of citizenship, and the amount in controversy, without interests and costs, exceeds the sum or value specified by 28 U.S.C. § 1332. Plaintiff is a citizen of California, and each of the defendants is a citizen of a state other than California.

59.     Venue is proper in this district pursuant to 28 U S.C. § 1391 and 18 U.S.C. § 1965 (RICO), because some of the acts and practices complained of herein occurred in substantial part within this district and because one or more Defendants reside, has an agent, or transacts their affairs within this district.

60.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

13

including without limitation, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets and exchanges.

FACTS COMMON TO ALL CLAIMS

61.     Section 1955 makes it unlawful to own "all or part of an illegal gambling business."

62.     One who purchases stock of a gambling business becomes a part owner of such business.

63.     Defendants caused ACWMF repeatedly to violate § 1955 within a ten-year period by causing ACWMF to purchase shares of "illegal gambling business[es]" within the meaning of § 1955.

64.     Each time ACWMF purchased stock of an illegal gambling business, it violated § 1955.

65.     Each of the Defendants knowingly developed, implemented, and continued (or conspired to develop, implement, and continue) an investment strategy pursuant to which ACWMF, through the Fund, was caused repeatedly and over a significant period of time to purchase shares of NETeller and Bwin.

66.     At various times, between December 1, 2004 and February 28, 2006, Defendants caused ACWMF, through the Fund, to purchase millions of dollars worth of shares of NETeller and Bwin.

67.     On multiple occasions between December 2004 and February 28, 2005, Defendants caused ACWMF, through the Fund, to purchase hundreds of thousands of shares of NETeller.

14

68.     In a quarterly report filed with the SEC dated April 28, 2005, ACWMF reported that as of February 28, 2005, it owned through the Fund 728,000 shares of NETeller valued at $8,673,000, or $11.91 per share. ACWMF continued to own through the Fund NETeller shares until the fourth quarter of 2005, when Defendants decided to heavily invest in Bwin.

69.     ACWMF did not purchase all 728,000 shares of NETeller in a single trade.

70.     Upon information and belief, when institutional investors such as ACWMF take a large position in a security, they often do so in multiple, relatively smaller purchases rather than in large blocks. They do so to avoid driving up the price of shares they intend to purchase through a large order. Upon information and belief, the purchases by Defendants complained of herein were in line with that industry practice, and Defendants employed dozens of separate purchases to accumulate the Fund's ownership stake in NETeller.

71.     The daily trading volume of NETeller shares in 2005 seldom exceeded 2 million shares and often stayed below 1 million shares.

72.     On multiple occasions between December 2005 and February 28, 2006, Defendants caused ACWMF, through the Fund, to purchase tens of thousands of shares of Bwin.

73.     In a quarterly report filed with the SEC dated April 21, 2006, ACWMF reported that as of February 28, 2006 it owned through the Fund 70,000 shares of BWin valued at $8,142,000, or $116.31 per share.

74.     ACWMF did not purchase its initial purchase of 70,000 shares of BWin in a single trade. As was the case with their purchase of NETeller shares, Defendants accumulated the Fund's ownership stake in Bwin through dozens of separate purchases between December 2005 and October 31, 2006.

75.     The daily trading volume of Bwin shares between December 2005 and June 2006 seldom exceeded 200,000 shares. Between July and October 2006, the daily volume seldom exceeded 1 million shares and often stayed below 500,000 shares.

76.     On multiple occasions between March 1, 2006 and May 31, 2006, Defendants caused ACWMF, through the Fund, to purchase additional shares of Bwin.

77.     In a quarterly report filed with the SEC dated July 28, 2006, ACWMF reported that as of May 31, 2006, it owned through the Fund 128,700 shares of BWin (an increase of 58,700 shares from the prior period) valued at $13,486,000, or $104.79 per share.

78.     On multiple occasions between June 1, 2006 and August 31, 2006, Defendants caused ACWMF, through the Fund, to purchase additional shares of Bwin.

79.     In a quarterly report filed with the SEC dated October 26, 2006, ACWMF reported that as of August 31, 2006, it owned through the Fund 186,500 shares of Bwin (an increase of 57,800 shares from the prior period) valued at $6,942,000 or $37.22 per share.

80.     By the time that Bwin abandoned its illegal U.S.-based revenue under pressure from U.S. law enforcement authorities in October 2006, the price of Bwin's stock had dropped to approximately $19 per share. Defendants did not allow the Fund to divest its ownership stake in Bwin until after Bwin abandoned its illegal gambling operations in the U.S.

81.     Defendants' investments in illegal gambling businesses were neither passive nor short term. For example, in a reported filed with the SEC on August 23, 2005, ACWMF reported that Defendants participated in two shareholders' meetings for NETeller. In an April 18, 2005 shareholders' meeting, Defendants voted to elect John Lefebvre as a director. Lefebvre was arrested by the FBI in January 2007 for operating NETeller as an illegal gambling business.

16

82.     During a June 22, 2005 shareholders' meeting for NETeller, Defendants voted in favor of two directors supported by NETeller management. Defendants knew or were reckless in not knowing that the directors they elected to sit NETeller's board intended to continue operating NETeller as an illegal gambling business.

83.     Defendants also approved an amendment to NETeller's share option plan. In the April and June 2005 meetings, Defendants voted with NETeller's management on every single issue proposed by management.

84.     In a report filed with the SEC on August 27, 2007, ACWMF reported that on July 13, 2006 – two days before the commencement of the law enforcement crackdown in the United States – Defendants participated in a special meeting of Bwin's shareholders and voted to change the company's name from BETandWIN Interactive AG to deemphasize the nature of its operations.

85.     At all times prior to and including July 15, 2006, Defendants intended to cause ACWMF – an open-ended investment company – to continue its ownership of illegal gambling businesses, including Bwin, indefinitely.

86.     Defendants regularly conducted and conspired to conduct the business of the funds they managed within the American Century mutual fund complex by seeking to exploit the risky but potentially lucrative opportunities associated with illegal gambling businesses. For example, certain of the Defendants, including ACC and the Directors, caused another mutual fund they controlled – American Century Mutual Fund, Inc. ("ACMF"), through its American Century Ultra Fund – unlawfully to invest over $72 million of investors' money in PartyGaming, another illegal off-shore gambling business similar to Bwin. During this same time period, they were causing ACWMF, through the Fund, to invest in Bwin. Those Defendants caused ACMF to

continue holding substantial ownership positions in PartyGaming until after the government's increased enforcement of the gambling laws in July 2006. Those Defendants did not permit ACMF to divest itself of its PartyGaming shares until sometime in July 2006.

87.     Those Defendants also caused another mutual fund they controlled, American Century Variable Portfolios, Inc., to own over 1 million shares of PartyGaming during the same time period that they were causing ACWMF, through the Fund, to invest in Bwin.

88.     In addition to the foregoing, Defendants also caused another mutual fund they controlled to purchase shares of NETeller. Between December 1, 2004 and November 30, 2005, Defendants caused the American Century International Opportunities Fund to purchase and hold hundreds of thousands of shares in NETeller. Like the Fund herein, the International Opportunities Fund is separate mutual fund series operating within the ACWMF structure.

89.     In a June 2005 prospectus distributed in connection with an initial public offering ("IPO") of its securities, PartyGaming warned prospective investors that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities." In the same prospectus, PartyGaming disclosed to prospective investors that it "generates most of its revenues from customers in the US (approximately 87 per cent. in the first quarter of 2005)." On June 26, 2005, *The New York Times* reported that, for PartyGaming, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan."

90.     In its prospectus, PartyGaming specifically warned that "any action by US authorities that succeeds in prohibiting or materially restricting PartyGaming from offering online gaming in the US would have very serious consequences for [PartyGaming] and could result in investors losing all or a very substantial part of their investment."

91.     Defendants knew or should have known of the contents of the PartyGaming prospectus because ACC and Directors caused ACMF, through its American Century Ultra Fund, to purchase over $72 million worth of PartyGaming's shares prior to July 31, 2005

92.     Additionally, prior to the investments in Bwin, the Directors had caused the Fund to purchase hundreds of thousands of shares of NETeller. Like PartyGaming, NETeller disclosed in its April 8, 2004 prospectus that its operations violated U.S. federal and state gambling laws.

93.     The U.S. government's increased enforcement actions directed against illegal Internet gambling included, but were not limited to, criminal and civil enforcement actions and legislative changes intended by Congress to make it more difficult for illegal Internet gambling businesses to circumvent existing laws.

94.     One way Congress sought to make it more difficult for illegal Internet gambling businesses to circumvent existing laws was to restrict their ability to transfer funds and choke off their source of revenue. Such efforts included passage of the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* (the "UIGE").

95.     During the time when Defendants lost 85% of the value of their investments in Bwin, the general market for the type of securities that Defendants told its investors that it would purchase for the Fund rose by over 35%.

96.     At the time of the investments complained of herein, it was well-established that gambling businesses operating outside the United States violated U.S. criminal law when they take wagers from gamblers in the U.S.

97.     Jay Cohen was convicted in February 2000 of running an Internet gambling business. On appeal, the United States Court of Appeals for the Second Circuit held that Cohen

and his organization, an Antiguan corporation that took bets over the Internet from gamblers in New York, violated the Wire Gambling Act, 18 U.S.C. § 1084, whenever there "was a telephone call or an internet transmission between New York and [defendant] in Antigua" that facilitated a bet or wager on a sporting event. *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001).

98.     On June 11, 2003, the DOJ issued a public warning letter reminding the public that "Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, and 1955 of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes."

99.     At the time of the investments complained of herein, it was also well-established that gambling businesses operating outside the United States may violate the criminal laws of individual states when they take wagers from gamblers in those states.

100.     In *State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, No. CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct., Greene Co., May 23, 1997), the court held that a foreign business violates Missouri criminal statutes, including state anti-gambling laws, when it provides gambling-related services to a Missouri resident over the Internet. In addition, the Missouri Attorney General has warned that online gambling is illegal under Missouri's general laws against gambling. *See* http://ago.mo.gov/publications/gambling3.htm.

101.     In *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852 (N.Y. Co. Sup. Ct. 2000), the New York State Supreme Court held that Cohen's company engaged in illegal gambling activity in violation of New York state law.

102.    In *United States v. Gotti,* 459 F.3d 296 (2d Cir. 2006), the United States Court of Appeals for the Second Circuit affirmed a conviction under § 1955 predicated on a violation of N.Y. Penal Law § 225.00, holding that "[w]hen bets are placed from New York, the gambling activity is illegal under New York law, regardless of whether the activity is legal in the location to which the bets were transmitted." 459 F.3d at 340.

103.    In addition to the foregoing, before Defendants first caused the ACWMF to invest in NETeller and Bwin, it was public knowledge in the United States, based on various news media reports and public press releases from the DOJ, that:

(a) In October 2001, New Jersey filed enforcement proceedings against various online gaming entities, including Sportingbet, for violating New Jersey's gambling laws.

(b) In October 2001, Gold Medal Sports, an online sportsbook located in Curacao, and its principals, pleaded guilty to racketeering in a criminal case brought by the United States Attorney for the Western District of Wisconsin.

(c) In April 2002, based on pressure brought by the Attorney General of New York, PayPal, the world's largest electronic payment processor, agreed to halt financial transactions on behalf of online gambling companies, which were taking bets from gamblers in New York in violation of New York state law. Banks, including Citibank, also settled claims brought by the New York State Attorney General by agreeing to halt payment processing for unlawful Internet gambling businesses.

21

(d) In March 2003, the United States brought suit against PayPal in Missouri for facilitating unlawful gambling activity. In July 2005, PayPal agreed to pay the federal government $10 million in penalties.

(e) In April 2004, the DOJ seized millions of dollars from cable TV stations that accepted advertising money from illegal Internet gambling businesses, including over $6 million from Discovery Communications.

104.    Prior to investing in NETeller, Defendants each knew, or was reckless in not knowing, that NETeller was an illegal gambling business.

105.    Prior to March 8, 2006, Defendants each knew, or was reckless in not knowing, that Bwin intended to acquire Ongame, a company that was taking bets from gamblers in the U.S., including, without limitation, Missouri and New York, and that law enforcement agencies in the U.S. considered Ongame's activities to constitute illegal gambling.

106.    Prior to March 8, 2006, Defendants each knew, or was reckless in not knowing, that Bwin intended to acquire Ongame for the purpose of becoming a business that would take bets from gamblers in the U.S., including, without limitation, residents of Missouri and New York.

107.    Prior to March 8, 2006, Defendants each knew, or was reckless in not knowing, that the purchase of shares of Bwin by ACWMF would aid and abet Bwin to acquire an illegal gambling business and to thereby to aid and abet Bwin to become an illegal gambling business.

108.     After March 8, 2006, Defendants each knew, or was reckless in not knowing, that Bwin was taking bets from gamblers in the United States, including, without limitation, from residents of Missouri and New York.

109. After March 8, 2006, Defendants each knew, or was reckless in not knowing, that law enforcement agencies in the U.S. considered the activities of Bwin to be illegal gambling.

110. After March 8, 2006, Defendants each knew, or was reckless in not knowing, that they were causing ACWMF to own part of a company that was taking wagers from gamblers in the U.S., including, without limitation, Missouri and New York.

111. When Defendants caused ACWMF to purchase stock in an illegal gambling business, ACWMF became a part owner of an illegal gambling business in violation of § 1955.

112. Prior to the investments complained of herein, Defendants each knew, or each was reckless in not knowing, that law enforcement agencies in the U.S. considered that off-shore gambling businesses that were taking or processing bets from gamblers in the U.S. were illegal gambling businesses within the meaning of § 1955.

113. On June 1, 2006, a U.S. grand jury indicted London-based BetOnSports Plc ("BetOnSports") – an unlawful Internet gambling business similar to Bwin – for racketeering, mail fraud and running an illegal gambling enterprise because it was accepting wagers from U.S. bettors in violation of U.S. law. The indictment was filed under seal, so investors did not learn about it until July 16, 2006, when U.S. law enforcement arrested its Chief Executive Officer, David Carruthers.

114. After July 16, 2006, the share prices of publicly held gambling companies that had been taking bets from gamblers in the US – including Bwin – fell dramatically.

115. There was no other material cause for the drop in Bwin share price other than Bwin's anticipated loss of illegal U.S.-based gambling revenue due to government enforcement efforts. That drop was the direct, proximate, natural, probable and reasonably foreseeable

consequence of Defendants' actions in causing ACWMF to invest in an illegal gambling business in violation of federal criminal law.

116. The government law enforcement actions described above, and the investment losses that followed those enforcement actions, were reasonably foreseeable and were part of the risk that Defendants created by investing in illegal gambling businesses.

117. Soon after the commencement of the law enforcement actions, Bwin shut down its U.S. operations and took an impairment charge of approximately $680 million.

118. After they became aware of significant losses in Bwin following the increase in U.S. government enforcement efforts directed against illegal Internet gambling, Defendants caused ACWMF to divest itself of all 186,500 shares in Bwin, realizing millions of dollars in losses.

119. In its quarterly report filed with the SEC dated January 29, 2007, ACWMF reported that, as of November 30, 2006, it no longer owned any shares of Bwin.

120. Defendants would not have caused ACWMF to sell its shares of Bwin, and would instead have caused ACWMF to continue to hold those shares indefinitely, had it not been for law enforcement actions directed against illegal Internet gambling.

121. Each of the Defendants agreed to cause, and participated in a scheme to cause, ACWMF to own part of illegal gambling businesses.

122. Pursuant to the foregoing agreement and scheme, one or more of the Defendants did in fact cause ACWMF repeatedly and over a significant period of time or in an open-ended scheme, to purchase stock in illegal gambling businesses for the Fund's portfolio.

123. ACWMF is an open-ended investment company whose activities affect interstate or foreign commerce.

124.    ACWMF is an enterprise within the meaning of RICO.

125.    Each of the Defendants is a person employed by or associated with ACWMF.

126.    Each of the Defendants had operational or managerial control over ACWMF.

127.    In causing ACWMF to purchase stock of an illegal gambling business, each of the Defendants exercised operational or managerial control over ACWMF.

128.    At the time that Defendants purchased NETeller shares, NETeller was an "illegal gambling business" within the meaning of § 1955 because the company was a gambling business that (a) violated the laws of one or more of the United States, including, without limitation, the laws Missouri and New York; (b) involved five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of $2,000 in any single day.

129.    Prior to March 8, 2006, Ongame was an "illegal gambling business" within the meaning of § 1955 because the company was a gambling business that (a) violated the laws of one or more of the United States, including, without limitation, the laws of the Missouri and New York; (b) involved five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of $2,000 in any single day.

130.    Bwin acquired Ongame on March 8, 2006.

131.    After March 8, 2006, Bwin was an "illegal gambling business" within the meaning of § 1955 because the company was a gambling business that (a) violated the laws of one or more of the United States, including, without limitation, the laws Missouri and New York; (b) involved five or more persons who conduct, finance, manage, supervise, direct, or own all or

25

part of such business; and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of $2,000 in any single day.

132.     Defendants' activities in causing ACWMF to become a part owner in illegal gambling businesses constituted an open-ended, continuous pattern of racketeering activity under 28 U.S.C. § 1962(c).

133.     Defendants were not mere passive owners of NETeller and Bwin. They caused ACWMF to vote at one or more of NETeller's and Bwin's shareholders meetings in favor of management-sponsored proposals, including the election of directors that Defendants knew would permit the companies to continue being operated as illegal gambling businesses.

134.     Directors arguments in *Seidl v. American Century Companies, Inc.*, 08 Civ. 8857 (DLC) (S.D.N.Y.) – for example, that investments in illegal activities cannot constitute RICO predicate acts and are not even really illegal (so long as the investment is made through a publicly-traded company listed on a foreign exchange) – confirm that even now, there is a threat that Defendants will continue to operate the ACWMF mutual funds without regard to the known criminal nature of the principal activities of the enterprises in which they invest.

135.     Certain Defendants have demonstrated a continuing interest in investing in Internet gambling companies. ACC and the Directors caused ACWMF in 2008 to purchase shares in 888 Holdings PLC, which operated several illegal Internet gambling businesses prior to withdrawing from the U.S. market in October 2006.

136.     Defendants conducted or caused to be conducted, or were reckless in failing to conduct or to cause to be conducted, due diligence before ACWMF purchased stock in illegal gambling businesses for the Fund's portfolio.

137. In the face of increased law enforcement, the stock prices of illegal gambling businesses, including Bwin, fell substantially, as the market re-priced the value of their shares to account for the loss or potential loss of illegal revenue derived from activities that violated anti-gambling laws in the United States.

138. As a direct, foreseeable, and proximate result of Defendants' acts in causing ACWMF to invest in illegal gambling businesses, ACWMF and Plaintiff were injured in their business or property.

139. Each purchase of shares by ACWMF in Bwin after March 8, 2006 caused ACWMF to own part of an illegal gambling business.

140. In addition to conducting or participating in the conduct of ACWMF's activities through a pattern of racketeering, Defendants also agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the affairs of ACWMF through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(d). Specifically:

(a) Defendants agreed to cause ACWMF to purchase and continue to own parts of illegal gambling businesses.

(b) Defendants agreed to cause ACWMF to purchase and continue to own part of a business that they knew was planning to become an illegal gambling business.

(c) In furtherance of such conspiracy, Defendants caused ACWMF to purchase and continue to own stock in Bwin, including the purchase of shares prior to March 8, 2006, knowing that Bwin intended to acquire Ongame.

27

141. ACWMF has been injured in its business or property by reason of Defendants' violations of § 1962.

142. Plaintiff has been injured in his property through Defendants' violation of 18 U.S.C. § 1962.

143. Said injuries were proximately caused by Defendants' racketeering activities and the overt acts taken in furtherance of Defendants' racketeering conspiracy.

144. Said injuries were the foreseeable, direct and natural consequence of unlawful investments in an illegal gambling business.

145. Defendants' actions breached their fiduciary duties to ACWMF.

146. Defendants' actions breached their fiduciary duties to each of the shareholders of the Fund.

147. Defendants' actions constituted negligence in that they breached a duty of care owed to ACWMF.

148. Defendants' actions constituted negligence in that they breached a duty of care owed to each of the shareholders of the Fund.

149. Plaintiff has been injured as a result of Defendants' breaches of fiduciary duties and negligence.

150. ACWMF has been injured as a result of Defendants' breaches of fiduciary duty, negligence and waste of assets.

151. The Independent Directors were just as culpable as the other Defendants. To an even greater degree than the directors of ordinary corporations, independent directors of a mutual fund are responsible for protecting the mutual fund's investors under a unique "watchdog" role.

152.    Each of the Directors had a special duty to ensure that ACWMF did not invest in criminal activities and enterprises, including illegal gambling businesses. Each of the Directors also had a duty to ensure that ACWMF had and followed proper control mechanisms to prevent its funds from making any investments in any illegal businesses.

153.    Mutual fund directors have a legal responsibility to monitor the fund investment adviser's trading practices.

154.    Upon information and belief, during the course of the conspiracy alleged herein, each of the Directors received regular reports from portfolio managers and other investment personnel concerning the Fund's investments. Through those reports and otherwise, each of the Directors became aware, even if they may have been previously ignorant, that ACWMF, through the Fund, had invested in illegal gambling businesses. After gaining that knowledge, the Directors joined the conspiracy, even if they had not previously been members of the conspiracy. The Directors participated in the conspiracy by deliberately failing to carry out their fiduciary and other legal responsibilities to halt the illegality at a time when doing so would have prevented the injury that Plaintiff and Fund investors have suffered as complained of herein. After Plaintiff and the Fund's investors suffered injury, and in furtherance of the conspiracy alleged herein, the Directors failed to take any action to seek redress on behalf of ACWMF and the Fund's investors for the injury they suffered as a result of Defendants' wrongful actions.

155.    After the injury complained of herein, and in furtherance of the RICO conspiracy alleged herein, the Defendants, including the Directors, conspired to conceal the injury and its cause from the Fund's investors to prevent the investors from bringing actions such

29

as this one seeking legal redress for Defendants' violations of RICO. Defendants did, in fact, conceal the injury and its cause from investors in the Fund.

156.    If any Director remained ignorant of the investments at issue throughout the course of the conspiracy, he or she would nevertheless be liable as if he or she had actual knowledge. Given the Directors' legal responsibilities and the reports they received, ignorance could only be the result of recklessness or willful blindness, either of which is the legal equivalent of actual knowledge.

### ALLEGATIONS COMMON TO ALL DERIVATIVE CLAIMS

157.    Plaintiff was a shareholder of ACWMF at the time of the transactions of which he complains.

158.    Plaintiff is a shareholder in ACWMF at the present time.

159.    This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

160.    Demand on the board of directors of ACWMF is excused for each and all of the following reasons:

(a) the Directors have an irreconcilable conflict of interest because they owe duties of undivided loyalties to two groups of shareholders of ACWMF whose interests conflict with respect to the prosecution of this action;

(b) a majority of the directors are so committed to the decision not to pursue the claims asserted in this action on behalf of ACWMF that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule;

(c) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation;

(d) a majority of the directors are so personally and directly conflicted that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule; and

(e) the wrongdoing of which Plaintiff complains constitutes inherently illegal criminal activity that is *ultra vires* and a *per se* violation of the business judgment rule.

161. Demand on the board of directors is excused because the entire board of directors of ACWMF is inherently conflicted because any decision to vindicate the rights of investors in the Fund against ACC and ACGIM would be contrary to the interests of shareholders of other funds on whose behalf Directors also serve and to whom they also owe a duty of undivided loyalty.

162. The Directors have duties of undivided loyalty to *all 11* of the funds that compose ACWMF – and not only to the Fund at issue here. The Directors therefore are charged with separate and independent fiduciary duties to the investors in the Fund as well as to the investors in the 10 other funds that constitute ACWMF.

163. The interests of the investors in the other funds that constitute ACWMF are antagonistic to those of the investors in the Fund with respect to the claims set forth in this Complaint because the fees allocated to and paid by the Fund on behalf of ACWMF to ACC and ACGIM help cover the expenses or losses of the other funds that compose ACWMF.

164. While recovery of the Fund's losses and management fees paid to ACGIM are in the best interest of the Fund's investors, the prosecution of these claims is not in the best

31

interests of the other 10 funds within ACWMF that did not invest in illegal gambling companies, and to which the Directors have separate and independent fiduciary duties. Any significant judgment against defendants ACC or ACGIM will adversely affect those 10 other funds.

165.     According to ACWMF's filings with the United States Securities and Exchange Commission ("SEC"), ACGIM provides all services necessary for the operation of the separate funds that compose ACWMF. ACGIM obtains the funds to pay for this in substantial part from the fees that Defendants allocate to the Fund. ACWMF's Annual Report for the fiscal year ending November 30, 2006 confirms that the Fund was allocated and paid $21,230,000 in fees to ACGIM on behalf of ACWMF. This amount was over 34 times greater than the average contribution of the 11 funds that compose ACWMF and 10 times greater than the median contribution.

166.     Were the Plaintiff to prevail in this litigation, ACGIM would be liable to forfeit all of the fees ACGIM has received on account of its management of the Fund's portfolio from the time that Defendants first caused ACWMF to purchase shares in Bwin. In that event – and particularly if ACGIM were also subjected to RICO treble damages – ACGIM would be unable to continue covering the operational expenses of the other funds that compose ACWMF and to which the board of directors also have fiduciary duties.

167.     Forfeiture of ACGIM's fees would also adversely affect the shareholders of all the other series funds that compose ACWMF because Defendants subsidize the other series mutual funds that compose ACWMF primarily with the fees allocated to and paid by the Fund as a regular way of doing business and for the purpose of boosting the returns of the other funds when they underperform. For example, Defendants used a portion of the management fees that the Fund paid on behalf of ACWMF in 2006 to subsidize the operations and expenses of the

32

International Value Fund. Were Plaintiff to prevail in this litigation, the subsidies would cease and prior subsidies would be liable to reallocation. This presents an irreconcilable conflict of interest between (a) the Fund and (b) the other 10 funds in ACWMF with respect to the outcome of this litigation. All the Directors are therefore disqualified from determining, on behalf of Nominal Defendant ACWMF, whether to pursue claims against ACGIM and its parent ACC.

168.    Because of the inherent conflict of interest faced by the entire board of directors of ACWMF, demand on them to bring suit against Defendants would be futile as a matter of law.

169.    A majority of the Directors are also so committed against the prosecution of Plaintiff's claims that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule. By their failure to act after learning of Plaintiff's claims, and by their affirmative conduct in this case, the Directors have shown that they are so committed to the position that the investments at issue were legal and that Plaintiff's claims have no merit that they cannot be expected to respond in good faith to a demand that those claims be pursued.

170.    This action was commenced approximately three years after the Fund suffered the losses complained of herein. During this time, although the Directors were aware of the losses and the cause of the losses, they took no steps to recoup the Funds' losses from those responsible. Their inaction after learning of the losses and its cause demonstrates that a demand would have been futile.

171.    In a complaint filed in the United Stated District Court for the Northern District of California on August 28, 2008, another plaintiff interposed claims against ACC, a sub-adviser to ACGIM and the Directors alleging violations of RICO, negligence, breach of

33

fiduciary duty, and waste arising from their investments in off-shore illegal gambling businesses on behalf of American Century Mutual Fund, Inc. ("ACMF") and its American Century Ultra Fund. In a stipulation filed in that action on September 24, 2008, those Defendants acknowledged service of the summons and complaint in that action.

172. Upon information and belief, although more than a year has passed since the Directors were served with Seidl's complaint in California (placing them on notice that investments in illegal gambling businesses was actionable), none of the Directors has taken any action to cause ACWMF to enforce the rights that Plaintiff now seeks to enforce on behalf of ACWMF.

173. In an order filed October 8, 2008, the district court in California, acting on its own motion, directed the parties to brief the issue whether the *Seidl* case should be transferred to New York or Missouri, noting that Seidl was from New York and the institutional defendants were located in Missouri. In response, Seidl voluntarily dismissed her action in California and re-commenced it in the Southern District of New York on October 15, 2008.

174. All of the defendants in the *Seidl* action, including ACC and the Directors, acknowledged service of the summons and complaint in that action. All of them answered the complaint on April 6, 2009. In their Answers, Defendants denied virtually all of the substantive allegations of the complaint and asserted various substantive defenses and affirmative defenses.

175. By order entered April 28, 2009, the district court in *Seidl*, relying on *McBrearty v. Vanguard Group, Inc.,* 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), dismissed Seidl's civil RICO claims, finding that Seidl could not satisfy the requirements of RICO proximate cause. The district court made no determination of the defendants' violations of federal and state criminal laws, including RICO and § 1955. The district court also made no

34

determination of the plaintiff's common law claims for negligence, breach of fiduciary and waste. Those claims were dismissed without prejudice for lack of an independent basis for federal jurisdiction.

176.    On May 8, 2009, Seidl filed an Amended Complaint to plead the Court's diversity jurisdiction over her common law claims. To preserve her RICO claims pending the *McBrearty* appeal, the Amended Complaint asserted those claims as well.

177.    On June 25, 2009, Defendants answered the Amended Complaint. They interposed virtually the same denials and asserted virtually the same substantive defenses and affirmative defenses that they had on their answers dated April 6, 2009.

178.    On July 2, 2009, Defendants moved for judgment on the pleadings on a variety of substantive and procedural grounds.

179.    On October 20, 2009, the district court in New York denied Defendants' motions for judgment on the pleadings without prejudice and allowed Seidl to file an amended complaint. Seidl did so, and Defendants moved to dismiss on December 18, 2009. In their motions, Defendants attacked the merits of each of Seidl's claims.

180.    Prior to answering the complaint or the amended complaint in the *Seidl* action, ACC and the Directors could have made a motion pursuant to Fed. R. Civ. P. 23.1 or moved for dismissal solely on the basis of the absence of a demand on the board of directors. This would have resulted in no material prejudice to their ability to pursue other procedural and substantive defenses in the event that such a motion was denied. Instead, the Independent Directors filed, on behalf of themselves and ACMF, responsive pleadings. They also filed a motion for judgment on the pleadings and a motion to dismiss in which the Independent Directors and ACMF attacked

the substance of all of Plaintiff's claims, denied the complaint's allegations, and interposed substantive and affirmative defenses on the merits.

181. By way of example, and not by way of limitation, in their answers, the Independent Directors asserted that all of the defendants' actions had been lawful. They asserted that any damages suffered were not proximately caused by Defendants' actions but were instead the result of an intervening superseding cause for which Defendants were not liable. They stated that the illegal gambling business operated legally in the states in which it conducted business, so that owning its shares cannot violate § 1955. The Independent Directors also alleged that Defendants "performed due diligence to the extent required by applicable law." Moreover, the briefs that the Independent Directors filed in support of their motions argued vigorously that claims similar to the ones raised by Plaintiff in the present action lack merit.

182. In moving for judgment on the pleadings, the Independent Directors could have left the substantive arguments to the other defendants, whose assertions would not have been binding on themselves or any mutual fund on whose behalf they purport to act in the future. Such a course of action would not have committed the Independent Directors to a position that renders them unable to assess any subsequent demand to redress the wrongs in the Complaint. Instead, the Independent Directors asserted substantive arguments regarding why none of the Defendants could be held liable as a matter of law for any of the *Seidl* plaintiff's claims. The Independent Directors also adopted the substantive arguments advanced by the other defendants in support of their separate motion for judgment.

183. Because the claims in this action are virtually identical to the claims in the *Seidl* action (although they involve a different mutual fund and a different illegal gambling business), the answers and the motion papers in the *Seidl* action establish that the Directors are

36

wholly committed to the position that all of Plaintiff's claims here are entirely without merit and should not be pursued on behalf of ACWMF.

184.    The Defendants in this action are represented by the same counsel as the Defendants in the *Seidl* action.

185.    When coupled with the passage of time between ACWMF's losses from its investments in Bwin and the filing of this action – a span of approximately three years – it is clear that the Directors have already made up their minds that they and the other Defendants behaved properly; that the investments they made in Bwin were legal; that ACWMF has no valid claims; and that the claims that Plaintiff seeks to pursue in this action against ACWMF should not be pursued.

186.    Plaintiff first interposed his claims here against Defendants in a complaint filed in the United Stated District Court for the Eastern District of California on August 4, 2009. In a stipulation filed in that action on September 11, 2009, Defendants acknowledged service of the summons and complaint in that action.

187.    Upon information and belief, although more than six months have passed since the Directors were served with Plaintiff's complaint in his action in California, none of the Directors has taken any action to cause ACWMF to enforce the rights that Plaintiff seeks to enforce on behalf of ACWMF.

188.    The Directors cannot reasonably be expected to respond to a demand in good faith or within the ambit of the business judgment rule given that they have already made up their minds and committed themselves to a course of action intended to defeat ACWMF's claims. Under these circumstances, demand is excused.

189.    Demand is also excused to avoid irreparable harm to ACWMF.

190. Since learning of Plaintiff's claims, the Directors have done everything in their power to prevent ACWMF from seeking redress for the injuries complained of herein against the Defendants, including themselves.

191. The Independent Directors moved for judgment on the pleadings in *Seidl* by asserting that claims similar to the ones raised by Plaintiff fail as a matter of law.

192. These positions irrevocably hobble ACWMF's ability to ever pursue redress for the injuries alleged in the Complaint, even if the board were now to change its position and decide to pursue such claims. Because the Independent Directors took substantive positions on the merits in a responsive pleading – instead of simply moving to dismiss for failure to make a demand – the Independent Directors have foreclosed any realistic possibility that they could seek redress on behalf of ACWMF for the claims alleged in this Complaint except through this derivative lawsuit. Even if their actions do not now absolutely preclude ACWMF from seeking such redress, at a minimum, the Directors' actions would materially and adversely affect ACWMF's ability successfully to seek such redress through any means other than this action.

193. The Independent Directors have precluded themselves from the ability to vindicate the claims of ACWMF and its shareholders' for entirely self-serving motives. Upon information and belief, the positions taken by the Independent Directors in their pleadings, their motions for judgment on the pleadings, and their motions to dismiss were intended in part to insulate them from personal liability for any future claim by any American Century mutual fund or its investors relating to unlawful investments in illegal gambling businesses.

194. Having participated in the conspiracy to cause ACWMF to invest the Fund's money in illegal gambling, the Independent Directors have now foreclosed, or at least materially impaired, ACWMF's ability to seek redress against any of the other Defendants except through

38

derivative action. This suit is the *only* vehicle through which ACWMF can be made whole. ACWMF would therefore be irreparably injured if demand is required because, through the Independent Directors' self-serving actions, ACWMF has lost any realistic chance of recovery on these claims except through the continuation of this suit. Accordingly, the Independent Directors have abdicated any right to determine whether the claims alleged in the Complaint should be prosecuted on behalf of ACWMF to redress injury to the Fund's investors.

195. In addition, a majority of the Directors are so personally and directly conflicted that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule because they are exposed to a substantial risk of criminal or civil liability for wrongs that constitute, among other things, crimes, bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of defendant Directors' duty of loyalty.

196. The Directors had a special duty to ensure that ACWMF did not engage in conduct that constituted a crime under state or federal law.

197. The Directors had a special duty to ensure that ACWMF did not invest in criminal activities and enterprises, including illegal gambling businesses.

198. The Directors had a special duty to ensure that ACWMF had proper control mechanisms to ensure that it did not commit crimes or make investments in illegal gambling businesses.

199. The Directors had a duty to monitor the trading activities of the investment adviser and other investment professionals.

200. The Directors received regular reports regarding the Fund's investments, and prior to July 15, 2006, they learned, if they did not know at the outset of the conspiracy, of the Fund's investments in illegal gambling businesses.

201. The Directors knew or were reckless in not knowing that ACWMF had invested in an illegal gambling business.

202. In view of their actions, the Directors face a substantial risk of criminal liability given the following facts, among others:

(a) As reported by *The New York Times* on December 25, 2005, one of the primary Congressional sponsors of the UIGE (Rep. Goodlatte of VA) has warned that if "investment houses are knowingly supporting and promoting illegal [Internet gambling] enterprises [that would be] very bad, and the Congress ought to investigate it."

(b) The DOJ issued public warnings that Internet gambling companies are criminal organizations and that supporting such criminal organizations was itself a crime.

(c) The United States Attorney for the Southern District of New York stated in a July 18, 2007 press release in connection with the prosecution of NETeller that "[s]upporting illegal gambling is not a business risk, it is a crime."

(d) On January 15, 2007, NETeller's founders, Stephen Lawrence and John Lefebvre, were arrested and charged with conspiracy to violate various anti-gambling laws, including § 1955. Lawrence and Lefebvre pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They also agreed to personally forfeit an additional $100 million;

40

(e) Jay Cohen, the CEO of World Sports Exchange, was convicted and sent to prison for operating an illegal gambling business, because his company, although legal in Antigua where it was based, solicited bets from U.S. residents;

(f) Peter Dicks, the independent, non-executive chairman of Sportingbet was arrested in New York on gambling charges;

(g) David Carruthers, the chief executive of BetOnSports, was arrested in Dallas and charged with racketeering fraud, tax evasion, and conspiracy;

(h) Anurag Dikshit, a major shareholder, director, and officer of PartyGaming pleaded guilty to charges of illegal gambling;

(i) Gary Kaplan, the founder of BetOnSports, pleaded guilty to RICO charges arising from illegal Internet gambling; he has been sentenced to 51 months in prison and ordered to forfeit $43.65 million;

(j) David Carruthers, the former CEO of BetOnSports, pleaded guilty to racketeering conspiracy and was sentenced to 33 months in prison.

(k) Discovery Communications was subject to a large asset seizure by the DOJ merely for taking advertising money from PartyGaming.

203.    In light of the government's attitude towards those who provide support for illegal Internet gambling and the fact that executives and directors have been prosecuted for violating RICO in connection with off-shore Internet gambling companies, Directors must be concerned that they, too, may face prosecution were the circumstances surrounding ACWMF's investment in illegal gambling businesses fully revealed during litigation.

204.    The threat that an investigation will uncover additional evidence that could expose the Directors to criminal and civil liability is particularly strong in this case. Defendants

41

are likely to have detailed non-public documentary evidence, currently unavailable to Plaintiff or his fellow investors, which provides information regarding what was known, and what was done, by each of the Defendants with respect to ACWMF's investments in illegal gambling businesses at various points in time throughout the conspiracy.

205.    The Directors cannot be indemnified, by insurance, by ACWMF, or by another person for their personal financial liability under RICO or for other serious wrongdoing, including the violation of § 1955, because that would be contrary to public policy.

206.    In addition to the foregoing, the relationship between the ACC, ACGIM, ACWMF, and the Directors creates inherent conflicts of interest that support a strong presumption against board independence and disinterest. Unlike most corporations, an investment company, such as ACWMF, is typically created and managed by a pre-existing external organization known as an investment adviser. Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between an investment adviser and a mutual fund is fraught with potential conflicts of interest. The Directors were all appointed by ACC (either directly or indirectly through ACGIM). The Directors owe their positions to ACC and ACGIM, and they can reasonably be expected to be reluctant to take any actions against ACC, ACGIM, their executives, or their subsidiaries.

207.    Demand upon the board of directors of ACWMF is also excused because the wrongdoing of which Plaintiff complains in this Complaint constitutes inherently illegal criminal activity that is *ultra vires* and a *per se* violation of the business judgment rule.

42

## CLASS ALLEGATIONS

208. Plaintiff seeks to represent a class of investors in ACWMF who purchased one or more shares in the Fund during the Class Period.

209. Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

210. The requirements of Fed. R. Civ. P. 23(a) are met because:

(a) The members of the Class are so numerous that joinder of all members is impracticable.

(b) There are questions of law and fact common to the Class, including whether:

|     |     |
| --- | --- |
| (i) | Defendants' acts and conduct as alleged herein violated RICO; |
| (ii) | Defendants breached their fiduciary and other duties to Plaintiff; |
| (iii) | Defendants committed negligence; |
| (iv) | Defendants' wrongful conduct proximately caused the injuries complained of; and |
| (v) | Defendants are required to forfeit all fees, commissions or other profits received from the time that they first violated their fiduciary duties. |

(c) Plaintiff's claims are typical of the claims of the members of the Class because all members of the Class were injured by Defendants' wrongful conduct in exactly the same way.

(d) Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's attorneys are qualified, experienced, and generally able to

43

conduct the proposed litigation. Moreover, Plaintiff has no interests antagonistic to those of the Class.

211.    The requirements of Fed. R. Civ. P. 23(b)(3) are met because:

(a) A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

|  |  |
|---|---|
| (i) | The Class members' individual interests are small, such that they would have no interest in individually controlling the prosecution of separate actions; |
| (ii) | No other litigation concerning this controversy has been commenced; |
| (iii) | It would be desirable to concentrate the litigation of these claims in this forum; and |
| (iv) | It is unlikely that there will be significant difficulties in managing this case as a class action. |

**FIRST CLAIM FOR RELIEF**
**(Derivative Claim)**
(Civil RICO, 18 U.S.C. § 1962(c))

212.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 207 above as if fully set forth herein.

213.    This claim is brought by Plaintiff derivatively on behalf of ACWMF pursuant to RICO, 18 U.S.C. § 1962(c), against Defendants.

214.    ACWMF is an enterprise engaged in and whose activities affect interstate and foreign commerce. Defendants are the directors, investment advisers and executives of ACWMF and therefore occupy managerial or operational positions with respect to the racketeering acts alleged herein.

44

215. Defendants agreed to and did conduct or participate in the conduct of ACWMF's affairs through a pattern of racketeering activity and for the unlawful purpose of owning part of illegal gambling businesses in violation of § 1955.

216. Pursuant to and in furtherance of their unlawful scheme, Defendants committed multiple racketeering acts by making numerous investments in illegal gambling businesses on several occasions extending over a year.

217. The foregoing acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

218. As a direct and proximate result of Defendants' violations of § 1962(c), ACWMF has been injured in its business and property.

**SECOND CLAIM FOR RELIEF**
**(Derivative Claim)**
(Civil RICO, 18 U.S.C. § 1962(d))

219. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 207 above as if fully set forth herein.

220. This claim is brought by Plaintiff derivatively on behalf of ACWMF pursuant to RICO, 18 U.S.C. § 1961(d), against Defendants.

221. ACWMF is an enterprise engaged in and whose activities affect interstate and foreign commerce. Defendants are the directors, investment advisers and executives of ACWMF and therefore occupy managerial or operational positions with respect to the racketeering acts alleged herein.

222. Each Defendant violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C. § 1962(c) by conducting or participating in the conduct of ACWMF's affairs

45

through a pattern of racketeering activity and for the unlawful purpose of owning part of illegal gambling businesses in violation of § 1955.

223.    Pursuant to and in furtherance of their unlawful conspiracy, one or more Defendants committed one or more overt acts in furtherance of the conspiracy.

224.    As a direct and proximate result of Defendants' conspiracy and the overt acts in furtherance of such conspiracy, ACWMF has been injured in its business and property.

### THIRD CLAIM FOR RELIEF
### (Derivative Claim)
(Breach of Fiduciary Duty)

225.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 207 above as if fully set forth herein.

226.    This claim is brought by Plaintiff on behalf of ACWMF against Defendants.

227.    Defendants have breached their fiduciary duties to ACWMF by causing ACWMF to invest in illegal gambling businesses.

228.    In causing ACWMF to invest in illegal gambling businesses, Defendants acted (a) in bad faith, (b) in a manner that they did not reasonably believe to be in the best interests of ACWMF, or (c) without the care that an ordinarily prudent person in a like position would use under similar circumstances.

229.    ACWMF has been injured as a proximate result of such breach on the part of Defendants and has suffered substantial damages thereby, including the loss in value of its investments and the payment, directly or indirectly, of commissions, fees and other compensation received by Defendants from the time that they first breached their fiduciary duties.

46

## FOURTH CLAIM FOR RELIEF
### (Derivative Claim)
(Negligence)

230.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 207 above as if fully set forth herein.

231.   This claim is brought by Plaintiff on behalf of ACWMF against Defendants.

232.   Defendants owe a duty to ACWMF to exercise reasonable care with respect investments by the Fund.

233.   Defendants breached their duty of care to ACWMF by causing ACWMF, through the Fund, to invest in illegal gambling businesses.

234.   ACWMF has been injured as a proximate result of Defendants' negligence and has suffered substantial damages thereby.

## FIFTH CLAIM FOR RELIEF
### (Derivative Claim)
(Waste)

235.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 207 above as if fully set forth herein.

236.   This claim is brought by Plaintiff on behalf of ACWMF against Defendants.

237.   Defendants each had a duty to ACWMF to prevent waste of ACWMF's assets.

238.   Defendants each breached their duties to prevent the waste of ACWMF's assets.

239.   Using Fund assets to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets. In purchasing such shares, Defendants diverted corporate assets for improper or unnecessary purposes.

47

240.     Use of corporate assets in violation of federal and state criminal laws is *per se ultra vires* and not a permissible exercise of business judgment.

241.     ACWMF has been injured as a proximate result of Defendants' waste and has suffered substantial damages thereby.

**SIXTH CLAIM FOR RELIEF**
**(Individual and Class Claims)**
(Civil RICO, 18 U.S.C. § 1962(c))

242.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 207 above as if fully set forth herein.

243.     This claim is brought by Plaintiff individually and on behalf of the Class pursuant to RICO, 18 U.S.C. § 1962(c), against Defendants.

244.     ACWMF is an enterprise engaged in and whose activities affect interstate and foreign commerce. Defendants are the directors, investment advisers and executives of ACWMF and therefore occupy managerial or operational positions with respect to the racketeering acts alleged herein.

245.     Defendants agreed to and did conduct or participate in the conduct of ACWMF's affairs through a pattern of racketeering activity and for the unlawful purpose of owning part of an illegal gambling businesses in violation of § 1955.

246.     Pursuant to and in furtherance of their unlawful scheme, Defendants committed multiple racketeering acts by making numerous investments in an illegal gambling business on several occasions extending over a year.

247.     The foregoing acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

248.     As a direct and proximate result of the Defendants' racketeering activities and violations of § 1962(c), Plaintiff and the Class have been injured in their business or property.

249.     Plaintiff and the members of the Class suffered special injuries not suffered by shareholders in ACWMF who were not investors in the Fund.

### SEVENTH CLAIM FOR RELIEF
### (Individual and Class Claims)
### (Civil RICO, 18 U.S.C. § 1962(d))

250.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 211 above as if fully set forth herein.

251.     This claim is brought by Plaintiff individually and on behalf of the Class pursuant to RICO, 18 U.S.C. § 1962(d), against Defendants.

252.     ACWMF is an enterprise engaged in and whose activities affect interstate and foreign commerce. Defendants are the directors, investment advisers and executives of ACWMF and therefore occupy managerial or operational positions with respect to the racketeering acts alleged herein.

253.     Each Defendant violated 18 U.S.C. § 1962(d) by conspiring and agreeing to violate 18 U.S.C. § 1962(c) by conducting or participating in the conduct of ACWMF's affairs through a pattern of racketeering activity and for the unlawful purpose of owning part of illegal gambling businesses in violation of § 1955.

254.     Pursuant to and in furtherance of their unlawful conspiracy, one or more Defendants committed one or more overt acts in furtherance of the conspiracy.

255.     As a direct and proximate result of Defendants' RICO conspiracy and the overt acts in furtherance of such conspiracy, Plaintiff and the Class have been injured in their business and property.

256.    Plaintiff and the members of the Class suffered special injuries not suffered by shareholders in ACWMF who were not investors in the Fund.

### EIGHTH CLAIM FOR RELIEF
**(Individual and Class Claims)**
(Breach of Fiduciary Duty)

257.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 211 above as if fully set forth herein.

258.    This claim is brought by Plaintiff individually and on behalf of the Class against all Defendants.

259.    Defendants owe a fiduciary duty to shareholders of ACWMF who invested in the Fund.

260.    Defendants have breached their fiduciary duties to Plaintiff and the Class by causing ACWMF, through the Fund, to invest in illegal gambling businesses.

261.    In causing ACWMF to invest in illegal gambling businesses, Defendants acted (a) in bad faith, (b) in a manner that they did not reasonably believe to be in the best interests of the shareholders of ACWMF who invested in the Fund, or (c) without the care that an ordinarily prudent person in a like position would use under similar circumstances.

262.    Plaintiff and the Class have been injured as a proximate result of such breach on the part of Defendants and have suffered substantial damages thereby.

263.    Plaintiff and the members of the Class suffered special injuries not suffered by shareholders in ACWMF who were not investors in the Fund.

## NINTH CLAIM FOR RELIEF
### (Individual and Class Claims)
(Negligence)

264.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 211 above as if fully set forth herein.

265.     This claim is brought by Plaintiff individually and on behalf of the Class against all Defendants.

266.     Defendants owe a duty to the shareholders of ACWMF who invested in the Fund to exercise reasonable care with respect investments by the Fund.

267.     Defendants breached their duty of care to shareholders of ACWMF who invested in the Fund by causing ACWMF, through the Fund, to invest in illegal gambling businesses.

268.     As a proximate result of Defendants' negligence, Plaintiff and the Class have been damaged.

269.     Plaintiff and the members of the Class suffered special injuries not suffered by shareholders in ACWMF who were not investors in the Fund.

51

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that, upon the trial of this action, Plaintiff recover for himself, for the Class, and for Nominal Defendant, from each Defendant, jointly and severally, as follows:

a) Compensatory damages for ACWMF on behalf of the Fund and its investors representing the loss in value of its investments resulting from Defendants' wrongful conduct;

b) Compensatory damages for individual shareholders representing the reduction in value of their investments resulting from Defendants' wrongful conduct;

c) Forfeiture and disgorgement of any commissions, fees or profits received by Defendants from the time of their first wrongful conduct;

d) Treble damages;

e) Punitive damages;

f) Recovery of Plaintiff's attorneys' fees, expert witness fees, and costs and disbursements of suit;

g) Pre-judgment and post-judgment interest; and

h) Such other and further relief to which Plaintiff is deemed entitled by the Court and/or the jury.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues that may be tried by jury.

Dated: January 19, 2010

/s/ John Wagner _____

John Wagner
Gregory P. Erthal
SIMMONS BROWDER GIANARIS ANGELIDES &
BARNERD LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
(618) 259-2222
jwagner@simmonsfirm.com
gerthal@simmonsfirm.com

*Attorneys for Plaintiff*

- and -

Thomas I. Sheridan, III
Andrea Bierstein
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
212-784-6400
tsheridan@hanlyconroy.com
abierstein@hanlyconroy.com

## VERIFICATION

Nelson Gomes, pursuant to 28 U.S.C. § 1746, hereby verifies, under penalty of perjury, that the foregoing complaint is true and correct to the best of his knowledge, information and belief, formed after reasonable inquiry.

Executed: January 21, 2010

_Nelson Gomes_
Nelson Gomes